RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0458P (6th Cir.)
File Name: 03a0458p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

ADREMY DENNIS,
  *Petitioner-Appellant,*

  *v.*

BETTY MITCHELL, Warden,
  *Respondent-Appellee.*

No. 99-4460

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 98-01155—James Gwin, District Judge.

Argued: December 2, 2003

Decided and Filed: December 29, 2003

Before: SUHRHEINRICH, SILER, and DAUGHTREY,
Circuit Judges.

———————————

### COUNSEL

**ARGUED:** John F. McCaffrey, McLAUGHLIN &
McCAFFREY, Cleveland, Ohio, for Appellant. Henry G.
Appel, ATTORNEY GENERAL'S OFFICE OF OHIO,
Columbus, Ohio, for Appellee. **ON BRIEF:** John F.
McCaffrey, McLAUGHLIN & McCAFFREY, Cleveland,
Ohio, Linda E. Prucha, PUBLIC DEFENDER'S OFFICE,

OHIO PUBLIC DEFENDER COMMISSION, Columbus,
Ohio, for Appellant. Henry G. Appel, ATTORNEY
GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for
Appellee.

———————————

### OPINION

———————————

SUHRHEINRICH, Circuit Judge. Petitioner Adremy
Dennis was convicted by an Ohio jury of the aggravated
murder of Kurt Kyle and sentenced to death. After
exhausting his direct appeals and state post conviction
remedies, Dennis sought a writ of habeas corpus in federal
court pursuant to 28 U.S.C. § 2254. The district court
dismissed the petition. For the following reasons, we affirm
the district court's dismissal of Dennis's habeas petition.

### I. Background

#### A. Facts

The Ohio Supreme Court made the following factual
findings on direct review:

  During the early morning hours of June 5, 1994,
defendant-appellant, Adremy L. Dennis, and Leroy
"Lavar" Anderson stopped Dean R. Pizer in the Highland
Square area of Akron and demanded money. Pizer
escaped, even though a shotgun blast was fired at him as
he fled. Shortly thereafter, Dennis shot and killed Kurt
O. Kyle during a robbery in front of Kyle's home at 818
Bloomfield Road. Dennis later admitted he shot Kyle
during a robbery, and he was subsequently convicted of
aggravated murder, attempted aggravated murder and
aggravated robbery, and sentenced to death.

  Late on Saturday, June 4, and in the early morning
hours of Sunday, June 5, Dennis and Anderson decided

to go to a bar and "meet some chicks." Anderson spoke of "robbing somebody," and the pair armed themselves with weapons: Dennis with a sawed-off shotgun and Anderson with a .25 caliber handgun. As the pair proceeded to the bar, the shotgun, according to Dennis, accidently went off. Dennis then reloaded the weapon. Before arriving at the bar, the two smoked marijuana.

After some drinks, Anderson and Dennis left the bar and encountered Dean Pizer in an alley near West Market Street and South Highland Avenue. The "taller one" of the two, whom Pizer identified as Dennis, was wearing a long black leather coat and told Pizer, "Give me your money. * * * Don't try and run, don't try and run. You are going to die tonight, you are going to die." Pizer testified that he went backwards, slid and rolled down a hill, then ran away unharmed. He heard a gunshot "just left of me. There was a trash can or something got hit."

That same night, Kurt Kyle had raced at Barberton Speedway and afterwards hosted several friends and family members at his home for a cookout and socializing. Later, as one of his guests, Martin Eberhart, was leaving, Kyle walked with him to his car where the two continued conversing for a short time. While Eberhart was seated in his car talking with Kyle, they heard a loud noise, which Kyle told Eberhart was a gunshot. About three minutes later, two black males approached them in the driveway, out of the view of Kyle's other guests. The man Eberhart identified as Anderson was wearing a green and orange Miami Hurricanes Starter jacket, and demanded money while pointing a gun a Eberhart's neck. Eberhart slowly reached under the car seat for his wallet and handed Anderson $15.

At that time, Dennis, whom Eberhart described as wearing a long, three-quarter-length dark coat, asked Kyle for money. However, Kyle searched through his

pockets and told Dennis that he had no money with him. Dennis then pulled out a sawed-off shotgun and shot Kyle in the head at point-blank range. Kyle died instantly of hypovolemic shock (loss of blood) due to a gunshot wound that severed both carotid arteries. According to Eberhart, the two assailants ran away together "sprinting very fast."

Anita Foraker, who lived in the neighborhood, was out walking her dog at around 1:30 a.m. that morning and heard a "loud pop type of sound." About a minute later, she observed two young black males headed in the opposite direction running by her on the other side of Bloomfield Road. She heard one say to the other, "Did you get it?"

A few days after the murder, Akron police received an anonymous phone call stating that someone at 371 Grand Avenue knew about the homicide that past weekend. Detective Donald L. Gaines and another detective went to the address, where they met Shirley Morgan and told her that a possible suspect was staying at her house. Morgan invited the detectives in and gave them permission to look around the house and to speak to her son, seventeen-year-old Lavar Anderson. When the detectives went down to the basement, they noticed a Miami Hurricanes jacket and a long, dark overcoat hanging up in the far corner on a bedrail. At that time, they took Anderson into custody, and he provided detectives information about the location of the murder weapon.

After procuring a search warrant, police seized several items from Morgan's basement, including the two coats, a .25 caliber pearl handle handgun, a 20 gauge sawed-off shotgun, and seven shotgun shells.

Upon completing the search of Morgan's home, Gaines received a call from two officers at 120 Burton

Avenue, which was in the same general neighborhood. The police surrounded the house on Burton and thereafter apprehended Adremy Dennis.

At the police station, Dennis was advised of his *Miranda* rights, which he waived. Dennis told several versions as to his whereabouts on June 4-5, 1994 to Detectives Gaines, Lacy, and Offret. After Dennis's second statement, Gaines produced a sawed-off shotgun, which Dennis immediately claimed was his own. In his fourth statement to detectives, Dennis admitted that he and Anderson had planned some robberies that night and admitted holding up Pizer, Eberhart and Kyle. However, while Dennis admitted aiming the sawed-off shotgun at Kyle, he also claimed the gun went off accidentally. Dennis agreed to allow detectives to tape his statement.

In his taped statement, Dennis said that he and Anderson had smoked marijuana and then drank at a bar before the robberies and murder. While Dennis admitted he fired the sawed-off shotgun three times that night, he asserted that each shot was accidental and that he "could barely focus" when they came upon Kyle and Eberhart. After shooting Kyle, Dennis claimed he almost fell down and that Anderson had to help him flee the scene.

Yellow shotgun shell casings were found a few days after the murder. One was found in the area where Pizer was accosted, the other was discovered in front of Kyle's home. Nancy E. Bulger, a forensic scientist with the Bureau of Criminal Identification and Investigation ("BCI"), determined that the two casings were fired from the sawed-off shotgun that Dennis identified as his own.

*State v. Dennis*, 683 N.E.2d 1096, 1099-1101 (Ohio 1997).

## B. Procedural History

Dennis was charged with one count of aggravated murder, one count of attempted murder, three counts of aggravated robbery, and one count of possession of dangerous ordnance. All of the counts carried a firearms specification, and the dangerous ordnance charge also carried a physical-harm specification. The aggravated murder count also carried two death specifications: murder during an aggravated robbery, where Dennis was the principal offender (Ohio Rev. Code § 2929.04(A)(7)); and murder committed as a course of conduct involving the killing or attempt to kill two or more persons (Ohio Rev. Code § 2929.04(A)(5)). *Id.* at 1101.

Dennis's trial began on December 12, 1994. The jury convicted him of all charges. After a mitigation hearing, the jury recommended the death penalty. On December 29, 1994, the court agreed and sentenced Dennis to death. *Id.*

Dennis appealed. On May 8, 1996, the Ohio Court of Appeals rejected his claims. *See State v. Dennis*, No. 17156, 1996 WL 233501 (Ohio Ct. App. May 8, 1996). Dennis appealed to the Ohio Supreme Court. On September 24, 1997, that court affirmed Dennis's conviction and sentence. *See State v. Dennis*, 683 N.E.2d 1096 (Ohio 1997). The United States Supreme Court denied certiorari. *See Dennis v. Ohio*, 522 U.S. 1128 (1998).

Dennis also exhausted his post-conviction remedies, to no avail. *See State v. Dennis*, No. 18410, 1997 WL 760680 (Ohio Ct. App. 1997) (affirming denial of post-conviction relief); *State v. Dennis*, No. 98-13, 690 N.E.2d 1287 (Ohio March 11, 1998).

On June 30, 1998, Dennis field a petition for writ of habeas corpus. On October 1, 1999, the district court denied his petition and denied Dennis's request for a certificate of appealability. This Court granted Dennis a certificate of appealability as to six issues.

## II.  Standard of Review

We review a district court's legal conclusions in habeas actions *de novo* and its factual findings for clear error. *Miller v. Francis*, 269 F.3d 609, 613 (6th Cir. 2001). If, however, the district court bases its decision on the state trial court transcript, and makes no findings of fact, we review the district court's fact findings *de novo* as well. *Id.*

## III.  AEDPA

Dennis's petition was filed on June 30, 1998, after the effective date of the Antiterrorism and Effective Death Penalty Act. Pub.L. 104-132, 110 Stat. 1214 ("AEDPA"). Its provisions therefore apply. *Id.*

"Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 123 S. Ct. 1398, 1401 (2003) (internal citations and quotation marks omitted). One of the mechanisms for accomplishing these goals was an amended version of 28 U.S.C. § 2254(d)(1), which places "new constraint[s] on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 549 U.S. 362, 412 (2000).[1]

The Act provides in relevant part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

---

[1] The district court issued its opinion on September 30, 1999, prior to the Supreme Court's decision in *Williams v. Taylor, supra,* and did not have the benefit of that decision in resolving this case.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.
(2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court explained the meaning of "contrary to" and "unreasonable application." A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court's decisions on materially indistinguishable facts. *Id.* at 412-13. An "unreasonable application" occurs when the state court correctly identified the correct legal principle from Supreme Court precedent but unreasonably applied that principle to the facts of the case before it. *Id.*

"[C]learly established Federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).[2]

---

[2] Dennis contends that the AEDPA does not apply to several issues in this case because the state court did not cite to any United Supreme Court precedent. This argument is without merit in light of *Early, supra.*

Similarly, a federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination. Rather, the state court's factual determination must be "objectively unreasonable" in light of the evidence presented during the state proceedings. Furthermore, a state court's factual determinations are presumed correct, and can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. Analysis

### A. Failure to Exclude Juror Harris

Dennis contends that the trial court violated his constitutional right to a fair trial in violation of the Sixth and Fourteenth Amendments because the trial court failed to excuse Juror Terri Harris for cause. During *voir dire*, potential jurors were asked whether any had been the victim of a crime of violence. Harris answered "no."[3] After the jury began penalty phase deliberations, a police detective contacted the prosecutor, asking that Harris be allowed to take a break from deliberations in order to sign a criminal complaint along with her two sisters. Although defense counsel and the prosecutor knew that Harris was going to be a witness in a case where the defendant was charged with the crime of gross sexual imposition, they did not know until the penalty phase that she was a victim. Upon learning that Harris was actually a victim, the prosecutor promptly informed defense counsel and the court.

The trial court called Harris into chambers and questioned her. Harris explained that, when asked if she had ever been a victim of a violent crime, she in turn asked the judge's bailiff, Alys, about the definition of violent crime, and "decided that what happened to me by your definition of

---

[3]The question posed was: "Violent crime; any experience whatsoever?" Juror Harris responded: "No."

violent would not be violent." She further explained that her answer was based strictly on the definition of murder. The trial court indicated that gross sexual imposition is considered a violent crime, but that it understood how Harris had interpreted it, and "that it might not have been clear as it probably should have."

The trial court also asked Harris if she thought the fact that she was a victim would interfere with her ability to evaluate this case. Harris responded:

> Absolutely not. I feel that I am a professional and I feel that what happened to me has nothing to do with what happened to the Kyle family or Adremy Dennis.
>
> I feel that I can handle it professionally and there is parts to everyone's personality and I feel very strongly that I can separate myself from that.
>
> You asked me to do a job and I'm doing a job.

When asked by the trial court whether she could "separate out your experience as a victim from this particular case and not let anything carry over that would cause you to identify more with victims," Harris responded that the two cases were not comparable. Finally, the court asked Harris whether she foresaw any possible problem. She responded that she did not, and stated that she was able to separate her emotions from her duty, just as the trial court had instructed. The trial judge then asked counsel if they had "anything." Defense counsel responded "[t]hat's fine." The prosecutor indicated that he had no questions. At that point the trial judge directed Harris to return to the jury room.

After Harris returned to the jury room, the trial court asked counsel if they wanted to put anything on the record. Defense counsel replied no. The prosecutor informed the trial court that, although they knew prior to trial that Harris was a witness, they had just learned that Harris was a victim.

The trial court then made the following findings of fact:

I think that she did give it some thought. She was not intentionally trying to conceal anything. She just did not recognize what we recognize, that a sexual abuse victim is to us a violent crime and I gather that is not terribly clear in the way we ask it.

And so she did make that inquiry of Alys and Alys' response was, well, when she says are they talking about murder, violent, she said I would imagine so, that she just dismissed it as not being something that would be covered under violent crime.

I was also satisfied with her answer as to her ability to handle it.

Upon this ruling, defense counsel did not ask that Harris be removed. However, after the jury returned and recommended to the court that Dennis be sentenced to death, Dennis moved for a mistrial, claiming that Harris was biased. The trial court denied the motion, ruling that Harris was *voir dired* by the court, the prosecutor, and by defense counsel, and thereafter passed to continue on with her service.

The Ohio Supreme Court held that the trial court had not abused its discretion by concluding that Harris was impartial and could remain on the jury.

During the jury's penalty-phase deliberations, the trial court learned that Harris had been a victim of sexual abuse as a child, when a detective asked the court to momentarily excuse Harris from deliberations in order to sign a criminal complaint. The court brought Harris into chambers before the parties and conducted a voir-dire examination of her at that time. Harris explained that she had decided not to mention the sexual abuse during the original voir-dire examination because she did not feel it fit the definition of violent crime. She reached this

conclusion after asking the trial judge's bailiff during jury selection for a definition of "violent crime." Harris indicated that at that time, she concluded that her experience was not "violent" when compared to murder, and therefore, did not bring it to the court's attention.

The court questioned Harris extensively, and she was adamant that her status as a victim of sexual abuse had nothing to do with what happened to the Kyle family or Dennis, and that she could separate the two experiences and be impartial. The court asked defense counsel if they had anything they wished to put on the record, and defense counsel indicated they did not. After Harris returned to the jury room, counsel for both sides informed the court that just prior to trial they became aware of the fact that Harris had been a witness to sexual abuse. Counsel for both parties agreed that it probably wasn't necessary for them to act upon it. However, at the end of the trial, defense counsel filed a motion for mistrial upon learning that Harris was a victim of sexual abuse, and not just a witness.

A trial court enjoys broad discretion in determining a juror's ability to be impartial. *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 351, 452 N.E.2d 1321, 1331. The trial court's decision to allow Harris to remain on the jury did not amount to an abuse of discretion, especially in light of the court's voir-dire examination of Harris conducted in chambers during penalty-phase deliberations. See *State v. Maurer*, (1984), 15 Ohio St.3d 239, 250-251, 15 OBR 379, 389, 473 N.E.2d 768, 781. Accordingly, Proposition of Law No. 5 is overruled.

*State v. Dennis*, 683 N.E.2d at 1103.

On habeas review, the district court held that the Ohio Supreme Court's opinion was not an unreasonable application of clearly established federal law, namely *McDonough Power*

*Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984). *See Dennis v. Mitchell*, 68 F. Supp.2d 863, 885-89 (N.D. Ohio 1999).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). *See also Morgan v. Illinois*, 504 U.S. 719, 726 (1992)(discussing *Irvin* and *Turner*). Furthermore, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan*, 504 U.S. at 727. The *voir dire* is designed "to protect [this right] by exposing possible biases, both known and unknown, on the part of potential jurors." *McDonough*, 464 U.S. at 554. Therefore, "[t]he necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *Id.*

When a juror's impartiality is at issue, the relevant question is "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). A trial court's determination of a juror's credibility is entitled to "special deference." *Id.* at 1038; *Wainwright v. Witt*, 469 U.S. 412, 426 (1985) (noting that in determining whether a juror is biased, "deference must be paid to the trial judge who sees and hears the juror"). As previously noted, a trial court's finding that a juror was impartial is entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Patton*, 467 U.S. at 1036 (noting that juror impartiality is a question of historical fact). Further, the question for this Court is simply whether the state trial court's decision was "fairly supported by the record," not whether it was right or wrong in its determination of impartiality. *Witt*, 469 U.S. at 424.

The *McDonough* test governs cases where it is alleged that a juror intentionally concealed information. *Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995).[4] In *McDonough,* the Supreme Court held that, in order to obtain a new trial based on a juror's non-disclosure during *voir dire*, the defendant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. The *McDonough* court explained that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

In *McDonough*, a juror failed to reveal during *voir dire* in a products liability case that his son had broken his leg as a result of an exploding tire when asked whether anyone in his immediate family had ever sustained a severe injury. *McDonough*, 464 U.S. at 549-50. In holding that the respondents were not entitled to a new trial, the Supreme Court found that the juror "apparently believed that his son's broken leg sustained as a result of an exploding tire was not such an injury." *Id.* at 555. The Court noted that jurors "may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges." *Id.*

We agree with the district court that the Ohio Supreme Court's ruling is not contrary to the rule of *McDonough*. As the district court noted, Harris explained that under the court's definition, she believed that she had not been a victim of a violent crime. Further, as the district court observed, upon hearing her explanation and observing her demeanor, the trial judge accepted Harris's explanation, and acknowledged that the court's definition of violent crime was not entirely clear.

---

[4]As we recently noted in an unpublished habeas decision, the *McDonough* test is not the exclusive test for determining whether a new trial is warranted on the basis of juror bias. *See Baker v. Craven*, No. 02-5252, 2003 WL 22455420, at *6 n.1 (6th Cir. Oct. 28, 2003) (and cases cited therein).

Thus, as in *McDonough*, juror Harris's misunderstanding of a legal term did not denote dishonesty.

In short, the Ohio Supreme Court's ruling that the trial court did not abuse its discretion in retaining juror Harris is not contrary to the foregoing clearly established Federal law. *See* 28 U.S.C. § 2254(d)(1). Consistent with Supreme Court precedent, the trial judge examined the witness to determine if she was impartial. The trial judge found as a matter of fact that Harris had not been intentionally deceitful during the original voir dire, that she could set aside her personal feelings, and that she was impartial. Thus, consistent with United States Supreme Court precedent, the trial judge established Harris's impartiality, during his in-chambers *voir dire*. Harris repeatedly indicated that she could be a fair and impartial juror, and the trial judge made a credibility determination that her misunderstanding of the term violence was honest. The trial court's fact findings are presumed correct, *see* 28 U.S.C. § 2254(e); *Patton.* The Ohio Supreme Court's decision is also not "an unreasonable determination of the facts in light of the evidence presented" to the state trial court.

Finally, it must be remembered that defense counsel was given the opportunity to question Harris directly during the in-chambers *voir dire* and to place any objections on the record, but failed to do so. Apparently, defense counsel did not doubt her veracity at the time either. The district court properly rejected this claim.

### B. Improper Removal of Jurors Spence and Williams

Dennis contends that the trial court improperly removed two jurors, Kathleen Spence and Ruby Williams, for cause based on their views of the death penalty. The Ohio Supreme Court held as follows:

In *State v. Frazier* (1995), 73 Ohio St.3d 323, 327, 652 N.E.2d 1000, 1006, we reaffirmed the standard in

*Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841,

" 'The proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.' "

Prospective juror Spencer stated unequivocally during voir dire that she did not feel she could recommend the death sentence. She further stated that she would have a "lot of trouble" imposing death, even if the court instructed the jury that it was worthy of consideration. Spencer also indicated that she did not feel she could put her beliefs aside and follow the law. When asked if she could recommend the death penalty, Spencer replied, "I don't feel I could really do that."

Prospective juror Williams also indicated that based on religious and moral grounds, she could not follow the law and recommend the death penalty. After further questioning, Williams insisted that "[i]t will be a big problem for me to sign and say that, yes, I believe in the death penalty or I believe this person should be given the death penalty."

We have previously stated that where the trial court is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law, deference must be given to the trial judge who sees and hears the prospective juror. *State v. Beuke* (1988), 39 Ohio St.3d 29, 38, 526 N.E.2d 274, 284-85. The trial court did not abuse its discretion in excusing the two prospective jurors for cause. Both expressed views that would prevent or substantially impair them from fulfilling their duties as jurors. *State v. Tyler*, (1990), 50

Ohio St.3d 24, 30, 553 N.E.2d 576, 586. Accordingly, we overrule Proposition of Law No.8.

*State v. Dennis*, 683 N.E.2d at 429.

The district court held that the Ohio Supreme Court reasonably applied clearly established federal law. *Dennis v. Mitchell*, 68 F. Supp.2d at 889. The district court noted that the Ohio Supreme Court followed the correct controlling United States Supreme Court precedent of *Witt*, 469 U.S. 412, which sets the standard for excusing jurors for cause. *Witt* held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424.

Based on this standard, the district court concluded that:

Here, both Spencer and Williams stated that they could not follow the law and recommend the death penalty. Before trial, the prosecutor, using the *Wainwright* language, asked juror Spencer if her "moral belief against the death penalty would substantially impair your ability to do that, to follow the law." Spencer then replied "Yes," indicating that her beliefs prohibited her from following the law. (Trial Tr. at 351.)

Similarly, the trial judge asked juror Williams if she could follow the law: "Our question to you is simply do you feel that you can go through that analysis, follow the law and make that recommendation if the circumstances of this case warrant it?" Williams simply replied "No." (*Id.* at 368.)

*Dennis v. Mitchell*, 68 F. Supp.2d at 889. The district court concluded that, based on these two exchanges, the trial court acted properly in excluding these jurors.

The Ohio Supreme Court's decision is not an unreasonable application of *Witt.* In *Witt,* the Supreme Court upheld that trial court's excusal for cause of a juror after she stated that her personal beliefs against the death penalty would interfere with judging the defendant's guilt or innocence. *See Witt*, 469 U.S. at 416. Similarly, in this case, the record reflects that both witnesses stated that they would be unable to sign a death verdict, regardless of the verdict. The district court's independent review of the state court record confirms the state courts' assessment that the jurors' views on the death penalty would substantially impair their performance. For these reasons, the Ohio Supreme Court's ruling is not contrary to *Adams v. Texas*, 448 U.S. 38 (1980) (holding that certain veniremen had been improperly excluded because they acknowledged that their views of the death penalty might "affect" their deliberations, but only to the extent that they would view their task with greater gravity), and *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (finding it improper to exclude veniremen simply because they voiced general objections to the death penalty or expressed conscientious or religious objections to its imposition), because the record reflects that the jurors had more than mere qualms or moral objection to the death penalty, but an inability or unwillingness to follow the law or obey their oaths. The district court properly rejected this claim.

### C. Questioning on Specific Mitigating Factors

Dennis contends that his rights to a fair trial and fair sentencing under the Eighth and Fourteenth Amendments were violated by the trial court's refusal to permit him to ask questions about specific mitigating factors during *voir dire.* Specifically, Dennis claims that he was foreclosed from asking prospective jurors questions regarding Dennis's age, lack of prior criminal history, environment, and other mitigating factors. The trial judge ruled that specific mitigating factors shouldn't be delved into, stating that "[t]he significant part is will they [the jurors] listen to what the

mitigating factors are and will they consider them. I think that is the bottom line."

The Ohio Supreme Court found no error.

In Proposition of Law No. 6, Dennis complains that he was denied due process when the trial court precluded defense counsel from questioning prospective jurors about specific mitigating factors. However, as Dennis concedes, we rejected this same argument in *State v. Wilson* (1996), 74 Ohio St. 3d 381, 385-387, 659 N.E.2d 292, 300-301. Similar to *Wilson*, the trial court here allowed adequate, detailed questioning of prospective jurors to expose faults that would render a juror ineligible. No abuse of discretion is apparent, and, therefore, this proposition of law is overruled.

*State v. Dennis*, 683 N.E.2d at 1105.

The district court held that the Ohio Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established United States Supreme Court case law. *Dennis v. Mitchell*, 68 F. Supp. 2d at 890.

As the Supreme Court observed in *Morgan*, "[t]he Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." *Morgan*, 504 U.S. at 729. At the same time, integral to the Sixth Amendment right to an impartial jury "is an adequate *voir dire* to identify unqualified jurors." *Id.* (citations omitted). Thus, the trial judge's discretion to restrict questioning is nonetheless "'subject to the essential demands of fairness.'" *Id.* (quoting *Aldridge v. United States*, 283 U.S. 308, 310 (1931)). *See also Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991) (stating that "[t]o be constitutionally compelled . . . it is not enough that such questions be helpful. Rather the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair").

For example, the Supreme Court has required *voir dire* on the issue of racial prejudice in situations of extreme racial tension, *see Ham v. South Carolina*, 409 U.S. 524 (1973) (holding that *voir dire* on race was constitutionally required where defendant, a civil rights activist, claimed that he had been framed because of his race); and interracial violence, *see Turner v. Murray*, 476 U.S. 28 (1986) (holding that *voir dire* regarding racial bias was constitutionally required in case involving interracial violence). By contrast, the Supreme Court has ruled that the mere fact that the defendant was black and the victim white was an insufficient basis, standing alone, to constitutionally require *voir dire* on racial bias. *Ristaino v. Ross,* 424 U.S. 589, 598 (1976). In *Mu-Min,* the Supreme Court held that the defendant's Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to due process were not violated by the trial judge's refusal to question prospective jurors about specific contents of news reports to which they had been exposed. The Court held sufficient the trial judge's question of whether any information would affect the juror's impartiality. *Mu-Min*, 500 U.S. at 431-32.

In other words, the Constitution requires only that *voir dire* be conducted in a manner which ensures fundamental fairness. Dennis has not made this showing. The record reflects that, even though defense counsel were eventually limited in asking particularized questions, the trial court permitted considerable latitude in the questioning of jurors during *voir dire*. Dennis's counsel was permitted to ask a number of veniremen questions regarding mitigating factors without interference from the trial judge. The following colloquy with Juror Wiggins exemplifies counsel's inquiry:

MR. WHITNEY: Our legislature has told us– as the Judge told you, Mr. Carroll told you, basically, that we have a two-part trial here. The first part has to do with guilt and innocence. The second part has to do with penalty.

Our legislature has told us that there are certain circumstances under which, even if a person is found guilty of a capital offense, that a jury can render a verdict for a life sentence.

Are you going to be able to accept what the Judge tells you regarding what we call mitigating factors, things like age and things like mental defects, if there is any, things like the upbringing of a person, those things? Can you take those things into consideration?

JUROR WIGGINS: Yes.

MR. WHITNEY: Do you think they are important in determining penalties?

JUROR WIGGINS: Yes.

MR. WHITNEY: What has been going on in this man's life before and how old he is and what kind of environment he came from.

Are those things going to be important to you in passing on a verdict of death or life, if the Judge tells you they are important?

JUROR WIGGINS: Yes, I think so.

MR. WHITNEY: If the Judge says they are factors that you can consider, then you would consider them?

JUROR WIGGINS: Yes.

Defense counsel followed this pattern of questioning for a number of witnesses Later, defense counsel asked the panel as a whole if any one had "any strong feelings about" evidence "of a psychological nature, evidence of behavior, social kind of evidence, psychological kind of evidence, upbringing, discipline, lack of discipline."

The trial court did not interfere with the questioning until defense counsel's colloquy with Juror Martin became more particularized. At that point the trial court cautioned simply that "[o]nce again, without interrupting, the questions are tough. But one of the things that has to be understood here is that the Court will instruct you on what mitigating factors you may consider." The trial judge instructed counsel to keep questioning as general as possible.

In short, the record reflects that Dennis's counsel was able to question the jurors regarding their ability and willingness to follow the law in the penalty phase. The Ohio Supreme Court's conclusion that the trial court "allowed adequate, detailed questioning of prospective jurors" is not an unreasonable determination of the facts in light of the record. Finally, Dennis failed to establish that the Ohio Supreme Court's ruling is contrary to United States Supreme Court precedent. The district court did not err in rejecting this claim.

### D. Peremptory Challenges

Dennis argues that the prosecutor's use of peremptory challenges to exclude prospective jurors Dortch and McGinnis based on their views of the death penalty violated his Sixth Amendment right to an impartial jury. Both Dortch and McGinnis indicated that they would be able to recommend the death penalty if the law required it, but they also stated that they maintained religious beliefs against the death penalty.

The Ohio Supreme Court overruled this claim, holding that "apart from excluding prospective jurors based on gender or race, . . . prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control." *State v. Dennis*, 683 N.E.2d at 1104 (citing state law). The district court agreed. *Dennis v. Mitchell*, 68 F. Supp. 2d at 890-91.

As the district court observed, the United States Supreme Court has held that peremptory challenges may be used for any reason so long as they are not based on immutable characteristics like race and sex. *Id.* at 891 (citing *Holland v. Illinois*, 493 U.S. 474 (1990)). Indeed, in *Holland,* the Supreme Court expressly rejected the petitioner's thesis that a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community deprives a defendant of a Sixth Amendment right to the "fair possibility" of a representative jury. *Holland*, 474 U.S. at 478. The Court stated that "[a] prohibition upon the exclusion of cognizable groups through peremptory challenges has no conceivable basis in the text of the Sixth Amendment, is without support in our prior decisions, and would undermine rather than further the constitutional guarantee of an impartial jury." *Id.* Furthermore, the *Holland* Court stated that peremptory challenges "best further[] the Amendment's central purpose" of jury impartiality, "by enabling each side to exclude those jurors it believes will be most partial toward the other side, . . . thereby 'assuring the selection of a qualified and *unbiased* jury.'" *Id.* at 483-84 (quoting *Batson v. Kentucky*, 476 U.S. 79, 91 (1986)). Dennis's reliance on *Witherspoon* is misplaced because *Witherspoon* dealt with the practice of excluding *for cause* jurors who expressed conscientious or religious scruples against capital punishment.

In short, the Ohio Supreme Court's opinion was not contrary to, nor an unreasonable application of, clearly established Untied States Supreme Court precedent.

### E. Batson Claim

Dennis also complains that the exclusion of Dortch and McGinnis, both African-Americans, violated *Batson, supra*. The Ohio Supreme Court concluded that Dennis failed to prove a violation of *Batson*.

The trial court held that "with *Batson* in mind," the state's peremptory challenges of prospective jurors

McGinnis and Dortch were proper. Moreover, the court's ruling was not "clearly erroneous" under *Hernandez.* The facts and circumstances underlying the prosecutor's exercise of peremptories on the two prospective jurors in issue do not appear to be racially motivated. Both prospective jurors expressed opposition to the death penalty on religious grounds. While, after defense questioning, both prospective jurors eventually opined that they thought they could impose a death sentence, the fact remains that both were still opposed to a death sentence, the fact remains that both were still opposed to capital punishment on religious grounds.

The prosecutor explained that he exercised peremptory challenges on McGinnis and Dortch based on their views of the death penalty. In addition, the prosecutor cited the fact that Dortch stated she had a cousin who had been murdered. Thus, the prosecutor gave a race-neutral explanation for the peremptory challenges. *Hill; Hernandez.* Accordingly, Proposition of Law No. 7 is without merit.

*State v. Dennis*, 683 N.E.2d at 1104.

The district court held that the court properly applied *Batson*.

In this case, the prosecution offered several neutral explanations for the exclusion of McGinnis and Dortch. First, the prosecutor explained that he used peremptory challenges on McGinnis and Dortch based, at least in part, on their views of the death penalty. Both prospective jurors expressed opposition to the death penalty on religious grounds. Though both prospective jurors eventually said they could impose a death sentence, both were nevertheless opposed to capital punishment.

Moreover, the prosecutor noted that prospective juror Dortch had a cousin that had been murdered and a son that had been convicted of a serious crime. Also, the prosecutor explained that a prospective juror McGinnis was consistently late and the only one confused about the jury procedures.

After directly observing the *voir dire* questioning, the trial judge found the use of peremptory challenges was not motivated by impermissible considerations. The trial judge stated that when Dortch and McGinnis were excused: "I consciously reviewed the circumstances relative to each of these two ladies and having no specific request at that time to place it on the record, it was the Court's determination that with *Batson* in mind, that at least in this Court's opinion that these were acceptable challenges on behalf of the state."

*Dennis v. Mitchell*, 68 F. Supp.2d at 891.

*Batson* requires the defendant to show that the prosecutor exercised a peremptory challenge on the basis of race. If that showing is made, then the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (summarizing three step analysis for a *Batson* claim).

The Ohio Supreme Court's decision was not an unreasonable application of *Batson*. The Ohio Supreme Court concluded that the trial court's ruling was not "clearly erroneous." The main reason the prosecutor struck the two jurors was their stated position on the death penalty. The trial court concluded that this explanation was credible. This finding is not clearly erroneous. *See Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam) (stating that, in habeas corpus proceedings, a state court decision about prosecutor's intent is a factual decision); *see also* 2254(e).

This claim is without merit.

### F. Ineffective Assistance of Counsel

Dennis argues that his counsel were ineffective for failing to issue timely objections to the removal for cause of jurors Spencer and Williams and the use of peremptory challenges to remove jurors McGinnis and Dortch.

After reciting the *Strickland* test [*Strickland v. Washington*, 466 U.S. 668 (1984)], the Ohio Supreme Court concluded that Dennis had not shown prejudice. *State v. Dennis*, 683 N.E.2d at 1108-09. The district court held that "Dennis was not deprived of any substantive or procedural right to which the law entitles him." *Dennis v. Mitchell*, 68 F. Supp.2d at 899.

The Ohio Supreme Court's holding was not an unreasonable application of *Strickland*. Because the Ohio Supreme Court concluded that none of the underlying challenges had merit, there is no cause and therefore no prejudice. The district court did not err in rejecting this claim.

### V. Conclusion

For all of the foregoing reasons, we **AFFIRM** the judgment of the district court denying Dennis's petition for writ of habeas corpus.