ROGERS, Circuit Judge,
concurring in part in Part I of the per curiam opinion:
In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court announced a three-part analysis to identify whether racial discrimination had motivated peremptory challenges in jury selection. First, the defendant must establish a prima facie case by showing that “the totality of the relevant facts gives rise to an inference of discriminatory purpose,” with respect to either a particular peremptory strike or a pattern of strikes. Id. at 93-94, 106 S.Ct. 1712. Second, the prosecutor must “come forward with a neutral explanation for challenging [the] jurors,” not based on racial or other impermissible classifications. Id. at 97, 106 S.Ct. 1712. Third, the trial judge then “will have the duty to determine if the defendant has established purposeful discrimination.” Id. at 98, 106 S.Ct. 1712; see also Johnson v. California, 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005); Burkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). This court has seldom addressed a Batson challenge, and on the rare occasion it has, our analysis of step three was limited.[1] A few observations beyond those stated by the court today are in order.
Justice Marshall, concurring in Batson, which he characterized as a “historic step toward eliminating the shameful practice of racial discrimination in the selection of juries,” had grave doubts that the goal of “endfing] the racial discrimination that peremptories inject into the jury-selection process” could be accomplished without “eliminating peremptory challenges entirely.” Id. at 102-03, 106 S.Ct. 1712 (Marshall, J., concurring). His doubts, he explained, arose because defendants are only able to attack discriminatory use of peremptory challenges where the challenges are so flagrant as to establish a prima facie case, and because trial judges face the difficult burden of assessing a prosecutor’s motives. See id. at 105-06, 106 S.Ct. 1712. As to the latter, Justice Marshall asked, citing examples from the case law:
*103 How is the court to treat a prosecutor’s statement that he struck a juror because the juror had a son about the same age as [the] defendant, or seemed “uncommunicative,” or “never cracked a smile” and, therefore “did not possess the sensitivities necessary to realistically look at the issues and decide the facts in this case”?
Id. at 106,106 S.Ct. 1712 (internal citations omitted). Justice Marshall foresaw that “[i]f such easily generated explanations are sufficient to discharge the prosecutor’s obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory.” Id.
Justice Powell, writing for the Court, responded:
While we respect the views expressed in Justice Marshall’s concurring opinion concerning prosecutorial and judicial enforcement of our holding today, we do not share them.... We have no reason to believe that prosecutors will not fulfill their duty to exercise their challenges only for legitimate purposes. Certainly, this Court may assume that trial judges, in supervising voir dire in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination. Nor do we think that this historic trial practice, which long has served the selection of an impartial jury, should be abolished because of an apprehension that prosecutors and trial judges will not perform conscientiously their respective duties under the Constitution.
Id. at 99 n. 22, 106 S.Ct. 1712 (majority opinion).
The Supreme Court, therefore, expected that trial judges, in fulfilling their duty, would effectively ensure that the justice system did not facilitate the denial of equal protection by remaining vigilant and attentive to the risk that overzealous prosecutors may inject racial strategies into jury selection in the effort to obtain a conviction. See, e.g., Duncan v. Louisiana, 391 U.S. 145, 155-56, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). The Court expected the trial judge would undertake “ ‘a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.’ ” Batson, 476 U.S. at 93,106 S.Ct. 1712 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).
The Supreme Court has repeatedly emphasized the significance of the trial judge’s role at step three. In Johnson, the Court explained:
The first two Batson steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant’s constitutional claim. “It is not until the third step that the persuasiveness of the justification becomes relevant — the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.”
545 U.S. at 171, 125 S.Ct. 2410 (quoting Purkett, 514 U.S. at 768, 115 S.Ct. 1769). Indeed, the defendant need not show that it is more likely than not that the peremptory challenges, if unexplained, were based on impermissible group bias, id. at 168, 173, 115 S.Ct. 1769, and the case proceeds to step three even if the prosecution “produces only a frivolous or utterly nonsensical justification for its strike,” id. at 171, 115 S.Ct. 1769. As explained in Snyder v. Louisiana, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008):
The trial court has a pivotal role in evaluating Batson claims. Step three of the Batson inquiry involves an evaluation of the prosecutor’s credibility, and “the best evidence [of discriminatory intent] often will be the demeanor of the *104 attorney who exercises the challenge.” In addition, race-neutral reasons for peremptory challenges often invoke a juror’s demeanor (e.g., nervousness, inattention), making the trial court’s firsthand observations of even greater importance.
Id. at 477, 128 S.Ct. 1203 (alteration in original) (internal citations omitted). A reviewing court, in turn, “ordinarily should give [the trial judge’s] findings” based on an evaluation of demeanor and credibility “great deference.” Batson, 476 U.S. at 98 n. 21,106 S.Ct. 1712.
“The Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.” Johnson, 545 U.S. at 172, 125 S.Ct. 2410. “The three-step process ... simultaneously serves the public purposes Batson is designed to vindicate and encourages prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process.” Id. at 172-78, 125 S.Ct. 2410 (citation and internal quotation marks omitted). The rights Batson vindicates, however, are not confined to the rights possessed by the defendant on trial, but extend “to those citizens who desire to participate ‘in the administration of the law, as jurors,’ ” id. at 172, 125 S.Ct. 2410 (quoting Strauder v. West Virginia, 100 U.S. 303, 308, 25 L.Ed. 664 (1880)), as well as to “the overriding interest in eradicating discrimination from our civic institutions [that] suffers whenever an individual is excluded from making a significant contribution to governance on account of his race” or other suspect characteristic, id. The “harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community,” for “[selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.” Batson, 476 U.S. at 87, 106 S.Ct. 1712; see also Powers v. Ohio, 499 U.S. 400, 412, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Long before Bat-son, the Supreme Court had observed: “For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.” Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940) (footnote omitted). The role of the trial judge, in either dispelling any notion that the proceedings have been affected by prejudice or repudiating such prejudice when it occurs, remains paramount, even today in the District of Columbia.[2] This important function of the trial judge is fully consistent with the motivations underlying Bat-son, 476 U.S. at 87, 106 S.Ct. 1712, and not served by conclusory or dismissive rulings of the district court.
Since Batson, when the Supreme Court has encountered cases where the trial judge failed to fulfill his or her duty, it has not hesitated to examine the voir dire *105 proceedings in painstaking detail, inasmuch as a single instance of racial discrimination in jury selection requires reversal of a conviction, see id. at 95-96, 106 S.Ct. 1712. An example of such detailed review is Snyder, where the trial judge failed to make a finding on the record based on the evidence presented regarding the prosecutor’s two explanations for striking an African American juror, and consequently the deference inherent in clear error review was replaced by what was tantamount to de novo review. See 552 U.S. at 479, 482, 128 S.Ct. 1203.[3] This is reflected in the practice of circuit courts of appeals when reviewing contentions that would normally be subject to clear error review but for the fact that the district court made no findings of fact. See, e.g., United States v. Microsoft Corp., 147 F.3d 935, 945 n. 7 (D.C.Cir.1998); see also United States v. Smith, 640 F.3d 580, 596 (4th Cir.2011); United States v. McMath, 559 F.3d 657, 663 (7th Cir.2009); Dennis v. Mitchell, 354 F.3d 511, 517 (6th Cir.2003); Armienti v. United States, 234 F.3d 820, 822 (2d Cir.2000); United States v. Vega, 221 F.3d 789, 795 (5th Cir.2000). As to the first of two explanations proffered, the Supreme Court reasoned in Snyder that, in the absence of a specific finding, it could not “presume that the trial judge credited the prosecutor’s assertion that [the juror] was nervous.” Id. As to the second proffered explanation, the Supreme Court concluded, quoting at length the transcription of the trial court proceedings, that the prosecutor’s “explanation given for the strike ... is by itself unconvincing,” id. at 478, 128 S.Ct. 1203, and that “[t]he implausibility of this explanation is reinforced by the prosecutor’s acceptance of white jurors who disclosed conflicting [time] obligations that appear to have been at least as serious as [those of the struck black juror],” id. at 483, 128 S.Ct. 1203; cf. Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (on habeas petition). Additionally, when confronted on habeas review with a state prosecutorial policy to strike African American members of the venire that resulted in a pattern of such strikes in Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196, the Supreme Court held, upon a searching record review, that the trial judge’s factual findings as to the nonpretextual nature of the state’s race-neutral explanations were wrong by clear and convincing evidence, id. at 266, 125 S.Ct. 2317. In a concurring opinion one Justice acknowledged Justice Marshall’s concerns and the defects intrinsic to the Batson analysis, see id. at 266-67, 125 S.Ct. 2317 (Breyer, J., concurring), and concluded that “a peremptory jury-selection system that permits or encourages the use of stereotypes work[s] at cross-purposes” with “the law’s antidiscrimination command,” id. at 271-72, 125 S.Ct. 2317.
The Supreme Court’s post-Batson precedent has forewarned lower courts that Batson objections are not to be lightly dismissed. A one-size-fits-all approach by the trial judge — summarily stating that the prosecutor’s explanations are credible — risks reversal of a conviction on appeal. The Supreme Court has held that the prosecutor’s response to an allegation of racially motivated peremptory strikes “must [be] a ‘clear and reasonably specific’ explanation of his ‘legitimate reasons’ for *106 exercising the challenges.” Batson, 476 U.S. at 98 n. 20, 106 S.Ct. 1712 (quoting Tex. Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). It would be remarkable, to say the least, to conclude that the trial judge’s evaluation at step three of the Batson analysis need not also be clear and reasonably specific.
Even though “these determinations of credibility and demeanor lie peculiarly within a trial judge’s province and ... in the absence of exceptional circumstances, [the Supreme Court] would defer to [the trial court],” Snyder, 552 U.S. at 477, 128 S.Ct. 1203 (second alteration in original) (internal citations and quotation marks omitted), no deference is due to the trial judge’s Batson ruling based on the evidence before it unless it explains on the record why it credited the prosecutor’s race-neutral explanation and rejected the defendant’s arguments that an individual strike was racially motivated or that a series of strikes demonstrated a pattern of racially motivated strikes. See id. at 479, 128 S.Ct. 1203; cf. Miller-El v. Cockrell, 537 U.S. at 341-43, 123 S.Ct. 1029. After all, in Batson, and before and after, the Supreme Court emphasized that purposeful racial discrimination in jury selection, resulting in the denial of equal protection, “harms not only the accused whose life or liberty they are summoned to try,” but “extends beyond that inflicted on the defendant and the excluded juror to touch the entire community,” “undermining] public confidence in the fairness of our system of justice.” Batson, 476 U.S. at 87, 106 S.Ct. 1712; see also Miller-El v. Dretke, 545 U.S. at 237-38, 125 S.Ct. 2317; Strauder v. West Virginia, 100 U.S. 303, 309, 25 L.Ed. 664 (1880). The Court’s precedent contemplates no less than that trial judges will give full consideration to the evidence presented of racial bias, see Snyder, 552 U.S. at 478,128 S.Ct. 1203, by, for example, comparing the prosecutor’s behavior in striking, not striking, and questioning like jurors of different races, looking for patterns or statistical disparities, and examining whether any policy or practice of the relevant prosecutor’s office implicates Batson concerns, see, e.g., Miller-El v. Cockrell, 537 U.S. at 331-35, 123 S.Ct. 1029.
Because the district court’s findings in the instant case were conclusory, without sufficient explanation to permit meaningful appellate review, the usual deferential review falls away and the question is whether this court, upon review of the record, finds by a preponderance of the evidence that the defendant has established purposeful discrimination by the prosecutor. Although not characterized by the Supreme Court as de novo review, the analysis of the court today, sifting struck-juror by struck-juror through the transcription of the Batson proceedings, much as the Supreme Court did for a single struck juror in Snyder, reflects this reality. See Op. at 42-44. The Supreme Court contemplated, inasmuch as a single Batson violation requires reversal of a conviction, see, e.g., Snyder, 552 U.S. at 478, 128 S.Ct. 1203, that the trial judge would provide a record that reveals on an objection-by-objection basis how, upon considering “all of the circumstances that bear upon the issue of racial animosity,” id. (citing Miller-El v. Dretke, 545 U.S. at 239, 125 S.Ct. 2317), the defense objections to the prosecutor’s strike explanations were resolved. Otherwise, the Supreme Court’s expectation of the constitutional protection institutionalized in Batson, as well as the expectations for the prosecutor and trial judge described in Justice Powell’s response to Justice Marshall’s concerns, will have proven illusory. This explains the painstaking review of the trial court record that the Supreme Court has undertaken, for example, in Snyder, 552 U.S. at 478-84, *107 128 S.Ct. 1203, and Miller-El v. Dretke, 545 U.S. at 240-66, 125 S.Ct. 2317, to underscore that the third step of Batson cannot become a matter of rote or one-size-fits-all analysis.
On the merits, appellants’ Batson challenges do not entitle them to reversal of their convictions, even upon de novo review of the record.[4] A single example suffices. Defense counsel challenged the striking of “Juror 5773” on the ground that the prosecutor was applying a double standard in peremptorily striking “Juror 5773,” an African American male, but not “Juror 6487,” a Caucasian male. Both were opposed to the death penalty. The prosecutor in his Batson step two response stated that “Juror 5773” gave equivocal answers about the death penalty and his religious views thereon. Appellants maintain that the record showed that the main concern of “Juror 5773” was not religious but a concern of condemning the wrong man to death. During the Batson colloquy, defense counsel had argued that “Juror 5773” had “some pro-prosecution instincts regarding the death penalty, but [was] generally thoughtful,” and disagreed that “Juror 5773” “would oppose the death penalty on religious grounds.” Instead of dealing with this factual disagreement and making reasonably specific findings on the record to which this court, as appropriate, could defer, the district court ruled as to all defense challenges that it credited the prosecutor’s explanation of non-racial reasons for all of the peremptory strikes of African American members of the venire.
A review of the transcription of the Bat-son proceedings supports the plausibility of the prosecutor’s race-neutral explanations for its peremptory challenge to “Juror 5773,” even upon de novo review. The relevant answers provided by the two veniremen in their questionnaires reveals a salient difference. The Caucasian venireman followed his expression of opposition to the death penalty with the statement: “I would try to abide by the Court’s instruction, not my personal belief.” By contrast, the African American venireman indicated his concerns about the death penalty would cause him to have concerns about being fair, explaining he had “so many questions about the death penalty and [his] belief in it.” Cognizant that the burden of persuasion to prove the existence of purposeful discrimination in peremptory strikes ultimately rests with the defendant, Johnson, 545 U.S. at 170-71, 125 S.Ct. 2410, it is apparent that the prosecutor’s proffered explanation that the difference in the veniremen’s answers and not a difference in their race motivated their disparate treatment. For essentially the reasons stated by the court with respect to the remaining strikes, see Op. at 42-44, each likewise survives de novo review of the record.
In view of the equal protection concerns identified earlier, a final observation bears mentioning. As a matter of public record, the jury venire in the District of Columbia in 2011 is unlikely, as it was in 2002 when jury selection began in the instant case, to have a majority of African American venire members, no matter how many are peremptorily struck by the prosecutor. The U.S. Census of 2000 showed that African Americans were 60.0% of the District of Columbia’s population, with Caucasians making up 30.8%; Hispanics or Latinos were 7.9%. The venire in the instant case was approximately three-quarters African American, and the twelve-member jury that was selected for trial was composed of nine African American jurors and three Caucasian jurors. The demographics have *108 changed. The U.S. Census of 2010 showed that African Americans comprise 50.7% of the District of Columbia’s population to Caucasian’s 38.5%, with Hispanics or Latinos comprising 9.1%. Likely then,[5] in a trial of an African American defendant, a prosecutor will no longer be able to pose the rhetorical question in the government’s brief, contrary to the purposes of Batson and its progeny: Why, as a matter of trial tactics, would the government discriminate in exercising peremptory challenges when the venire and the petit jury would be overwhelming African American? Appellee’s Br. at 68; see also May 7, 2002 PM Trial Tr. at 25, 32. Courts in the District of Columbia likewise will likely be unable, as a factual matter, to base acceptance of a prosecutor’s race-neutral explanations for strikes at Batson’s third step in part on the generality, as in 2002, that a predominantly African American jury will nonetheless be seated. To the extent distrust of the justice system among minorities and women persists, based in part on fear that they will be discriminated against during jury service, see supra note 2, accepting the prosecution’s approach, as reflected in the rhetorical question, suggests in view of the changing demographics in the District of Columbia at least two concerns: First, a growing risk that an overzealous prosecutor could be successful in turning a jury toward conviction based on racially motivated or otherwise discriminatory peremptory strikes. Second, such activity by prosecutors would result in greater mistrust of the justice system and reduced participation in jury service by the affected populations.

. See United States v. Watson, 483 F.3d 828 (D.C.Cir.2007); United States v. Spriggs, 102 F.3d 1245, 1254-55 (D.C.Cir.1996); United States v. White, 899 F.2d 52 (Table), 1990 WL 42213 (D.C.Cir. Apr. 4, 1990). By contrast, the Batson issue has been fulsomely explored on multiple occasions by the District of Columbia Court of Appeals where the United States Attorney is also responsible for prosecutions involving felonies and major misdemeanors under the D.C. Code. See, e.g., Smith v. United States, 966 A.2d 367, 369-88 (D.C.2009).

. A five-part study of jury service in the District of Columbia by the National Center for State Courts identified that among the reasons the general public avoids jury service is perceived unfairness and biases in the justice system. See Richard Seltzer, The Vanishing Juror: Why Are There Not Enough Available Jurors?, 20 Just. Sys. J. 203, 212 (1999). Various recommendations have been developed to address this perception, including the elimination or curtailment of peremptory strikes that in "the experience of most trial judges ... at a minimum, give[ ] the appearance that prospective jurors are being peremptorily stricken on grounds of race, gender or both.” Council For Court Excellence: District of Columbia Jury Project, Juries for the Year 2000 and Beyond: Proposals to Improve the Jury Systems in Washington, D.C. 26 (1998).

. In adopting a clear error standard of review, the Supreme Court in Snyder, 552 U.S. at 477, 128 S.Ct. 1203, cited the plurality opinion in Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), in which concern was expressed that a more searching review of findings made in a state trial court would be incompatible with concepts of federalism. Id. at 369, 111 S.Ct. 1859. No federalism concern exists with respect this court’s review of the district court's Batson ruling.

. Appellants do not pursue on appeal their Batson challenges based on gender. See Appellee’s Br. at 28 n. 21.

. Individuals are called for jury service in the District of Columbia based on lists of registered voters, licensed drivers, and those having nondriver identification cards from the D.C. Department of Motor Vehicles. See Seltzer, supra note 2, at 204.