*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0191p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

--------

FREDERICK JESSE HARRIS,

       *Petitioner-Appellant,*

    *v.*

     No. 05-5591

GLENN HAEBERLIN, Warden,

       *Respondent-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 03-00754—John G. Heyburn II, Chief District Judge.

Argued: November 1, 2007

Decided and Filed: May 22, 2008

Before: BATCHELDER, COLE, and GRIFFIN, Circuit Judges.

--------

## COUNSEL

**ARGUED:** David J. Debold, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant. Samuel J. Floyd, Jr., OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** David J. Debold, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant. Samuel J. Floyd, Jr., OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

    COLE, J., delivered the opinion of the court, in which GRIFFIN, J., joined. BATCHELDER, J. (pp. 11-16), delivered a separate dissenting opinion.

--------

## OPINION

--------

    R. GUY COLE, JR., Circuit Judge. Petitioner-Appellant Frederick Harris, a Kentucky state prisoner, appeals the dismissal of his petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254, from the United States District Court for the Western District of Kentucky. Harris invokes the case of *Batson v. Kentucky* to challenge the prosecution's exercise of its peremptory strikes as race-based and therefore violative of the Equal Protection Clause of the United States Constitution. Upon conducting the requisite *Batson* analysis, the state trial court rejected Harris's claims.

    After Harris's conviction but prior to his appeal to the Supreme Court of Kentucky, the defense team discovered that the courtroom cameras had turned on and captured a private conversation among the prosecutorial team as it was discussing the exercise of its peremptory

challenges. Notwithstanding this newly acquired evidence, the Supreme Court of Kentucky affirmed Harris's conviction. *Harris v. Kentucky*, No. 1998-SC-0414-MR (Ky. Feb. 24, 2000) (unpublished). In his petition for federal habeas corpus relief, the district court also found no violation of *Batson*.

On appeal, Harris now argues that the district court erred in its application of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") when it denied his petition for a writ of habeas corpus. Specifically, Harris asserts that, in upholding the Supreme Court of Kentucky's denial of his *Batson* challenges, the district court engaged in an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the newly discovered videotape evidence. For the following reasons, we **VACATE** the district court's dismissal of Harris's *Batson* claim and **REMAND** to the district court for a renewed *Batson* hearing in light of the after-acquired videotape evidence.

## I.

### A.    Factual Background

On March 13, 1998, a Kentucky jury found Harris guilty of kidnapping, three counts of robbery, and being a persistent felony offender. According to the trial testimony of Barbara Morris, one of Harris's companions, on July 20, 1997, Harris approached Morris while she was in a parking lot at a Kroger grocery store in Louisville, Kentucky. Brandishing a gun, Harris forced Morris into her own van and proceeded to drive the van out of the parking lot with the gun visible on his lap. Harris first drove the van to a wooded area in Indiana, where he searched through the contents of the vehicle and Morris's purse. Harris then drove the van to a nearby bank, where he tested Morris's automatic teller machine cards and attempted to withdraw money from her account. The attempt failed, however, because Morris could not remember the personal identification number required to access the account.

Harris proceeded to several retail stores and told Morris that she would not face any danger if she cooperated. The first store on their route was an H.H. Gregg electronics store in Clarksville, Indiana, where Harris purchased computer equipment and coerced Morris into writing a check to cover the costs. The pair then went to a nearby Office Max store, and Morris purchased more computer equipment on Harris's behalf. Their next destination was a Target store, where Morris wrote another check for the purchase of a television and other goods Harris selected. The two proceeded back to Kentucky and made additional purchases at another H.H. Gregg store. After departing the second H.H. Gregg, Harris drove the van to a Kinko's copy store to make copies of the receipts from his recent purchases and then to a White Castle franchise, where he bought forty dollars worth of fast food using Morris's credit card.

Their final destination was another Kroger store, where Harris tried to use Morris's credit card to buy over $800 in cigarettes. Upon hearing Harris's order, an employee at Kroger became suspicious and called the police to report potentially fraudulent credit card activity. The police arrived at Kroger and, after hearing Morris's account, arrested Harris. According to Morris, she remained with Harris over the entire nine-hour course of events and did not attempt to flee because Harris carried a gun with him at all times.

In contrast to Morris's account of the events, Harris claims that their interaction began at Morris's initiation. Specifically, Harris alleges that Morris approached him in the Kroger parking lot and asked for his assistance in opening her van because she was carrying a load of groceries in her arms. After helping her, Harris proceeded to a bus stop to wait for a friend, Donnell Flippins, when Morris pulled alongside the stop and offered to give him a ride. Harris agreed to receive a ride because he "figured she wanted more than just to do someone a favor." (JA 334.) Harris then asked Morris to drive him to Flippins's residence. Once they arrived there, Harris dispatched Morris to

purchase cigarettes, and, in the meantime, explained to Flippins that the two of them would be unable to undertake their usual Sunday scams, consisting of writing fraudulent checks to stores in exchange for goods and then returning the goods to the stores later that day for cash. Harris testified to telling Flippins that "I met this young lady, Barbara, and we're going to spend some time together; she wants to spend some time with me." (*Id*.)

Once Morris returned with the cigarettes, Harris and Morris left for Harris's apartment so that the two of them could "spend some time together." (*Id*.) Since a co-tenant was using the apartment, Harris directed Morris to drive them to his alternate home, where the two discussed their respective pasts and criminal histories with each other. Upon hearing of Harris's criminal operations, Morris asked Harris if she could join his activities by offering her credit cards to buy goods that he could then sell to a "fence" for half the price. Pursuant to this arrangement, Harris accepted orders for various merchandise from his "fence" and used Morris's credit card with her consent on the shopping spree delineated above. According to Harris's version of the story, it was Morris's request for protection that led him to carry a gun throughout the entire shopping spree. Moreover, Harris claimed that Morris voluntarily participated in all the shopping exchanges.

## B.    Procedural History

Based on the facts recounted above, the Commonwealth of Kentucky indicted Harris for kidnapping, three counts of robbery, and being a persistent felony offender. During the jury selection process, the prosecution exercised four of its nine peremptory challenges to eliminate prospective African-American jurors from the jury pool. Harris objected to the prosecution's use of its challenges, claiming that the pattern of peremptory strikes established a prima facie showing of purposeful racial discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986).

In response to the alleged *Batson* violations, the prosecutor proffered race-neutral justifications for the strikes. Specifically, the prosecution explained that it excused juror 160 because he fell asleep during voir dire; juror 49 because she had difficulty following questions asked of her, was joking with a neighboring juror who was subsequently struck for cause, and had a grandson who was convicted for his involvement in a shooting; and juror 47 because she was a paralegal at a local law firm and had previously served as a juror in a robbery case in which Harris had been acquitted. The trial judge agreed that juror 160 had slept through a portion of the voir dire and that juror 49 appeared to have trouble understanding some of the questions posed to her. Therefore, the judge made a finding that the prosecution had employed all its peremptory strikes in a race-neutral fashion and rejected Harris's *Batson* claim.

Subsequently, on March 13, 1998, the jury found Harris guilty on all counts, and Harris was then sentenced to 75 years in prison. The Commonwealth also indicted Harris for possession of a handgun by a persistent felon, and Harris entered a guilty plea to this charge prior to the jury's deliberation. The court accepted Harris's plea and sentenced him to three years for the felon-in-possession charge, to run concurrently with the 75-year sentence.

After trial and sentencing, Harris's counsel discovered that an in-court videotape system used to record court proceedings had reactivated during a recess when the chief prosecutor Dolan, the assistant prosecutor David Schuler, and the detective John Aubrey were engaged in a private discussion about how to exercise the last of their nine peremptory challenges. The discussion further made clear that the prosecutorial team had already decided how to allocate their previous eight peremptory strikes. The recorded conversation proceeded as follows:

> DOLAN: Okay, this is who we got guys so far. We got 76, [name deleted]. That's the guy we at first liked, but who had been accused by his girlfriend. We've got 128, [name deleted], kind of hippy, with the beard and the hair, who sat behind [name

deleted]. He was on the not guilty jury. We've got [name deleted], 82. She was the last person on the second row. She was also a juror on the carrying concealed deadly weapon charge, which was a 10-2 to acquit. We've got [name deleted], who is the girl at Seiller and Handmaker [a local law firm]. We've got 77 [name deleted], who you originally liked, but who was a juror on the Robbery I case. We've got [name deleted], 138. She was the black female who said her cousins were charged and convicted of armed robbery. *We've got [name deleted], 49, she's the old lady, the black lady. The other one is already off.* Then there's [name deleted], 160, the first guy out here, who was sleeping. We've got one more to go. What do you guys think?

AUBREY: How about the lady that sat right here (gesturing)? She's on her third criminal jury.

SCHULER: Have you got anything down for [name deleted], number 151?

DOLAN: He sat on a rape charge a long time ago.

SCHULER: He's pretty old?

DOLAN: There are a lot of old people on here.

SCHULER: How about the guy in the first row, number 53? He was one of the ones who said he wanted to see some evidence? Black shirt. What does he do?

DOLAN: Supervisor at (unintelligible) . . . I'm going to do this old guy, 152, because he was also on that jury.

(emphasis added).

On appeal to the Kentucky Supreme Court,[1] Harris characterized the videotape as "smoking gun" evidence of the prosecution's reliance on race in employing its peremptory challenges, particularly with respect to juror 49 whom Dolan referred to as "the old lady, the black lady." (JA 184.) Upon reviewing the videotaped evidence along with the trial court record, however, the Supreme Court of Kentucky affirmed the trial court's decision and rejected Harris's *Batson* claim. The court found that "[t]he record supports the prosecutor's articulated reasons for striking juror 49, and the remarks he made during the partial recording of the peremptory strike conference do not tend to prove otherwise. Nor do they tend to prove that any of the other three peremptory strikes in question were racially motivated." *Harris v. Kentucky*, No. 1998-SC-0414-MR at *9 (Ky. Feb. 24, 2000). Under the majority's view, the prosecutor's reference to juror 49 as "the old lady, the black lady" was "no more racist than [Harris's own] referral to the victim as a 'middle-aged white lady'[in his trial testimony]." *Harris*, No. 1998-SC-0414-MR at *8.

Furthermore, the court rejected Harris's assertion that Dolan's statement, "the other one is already off[,]" referred to another African-American woman in the jury pool "because none of the other six jurors who were excused for cause were African-American females." *Id.* "More likely," the court opined, "the remark referred to juror 155, with whom juror 49 had been seen talking and

---

[1]Upon appeal to the Kentucky Supreme Court, Harris raised several claims in addition to his *Batson* claim, including violation of the Double Jeopardy Clause, improper influence on the jury, improper sentencing enhancements, denial of a fair trial based on allegedly improper communication between a juror and the prosecutorial detective during trial, and ineffective assistance of counsel. Since the district court limited its issuance of a certificate of appealability solely to the *Batson* claim, Harris's other claims are not presently before us.

joking, and who had been excused for cause because she claimed to have witnessed a part of the crime . . . ." *Id.*

Dissenting from the majority, however, three of the seven justices wrote separately to express their opinion that the case should have been remanded to the trial court to allow for consideration of the videotaped evidence. Because this footage was unavailable at the time of the trial court proceeding, the dissenters would have ordered the trial court to re-conduct a *Batson* hearing in light of the new evidence. Underlying the dissent's recommendation was the belief that the trial court "sits in a superior position, after considering this new evidence together with the prior evidence, to finally determine whether a *Batson* violation occurred." *Id.* at *2.

Additionally, the dissenting justices disapproved of the majority's willingness to affirm the trial court's *Batson* finding on what they called the "basis of probabilities." *Id.* Contrary to the majority's interpretation, the dissent instead recognized that Dolan's statement that "the other one is already off" could have just as plausibly referred to juror 138, an African-American woman whom the prosecution had already excused from the jury pool. Under this alternative reading, the dissent believed there was a "possibility that the Commonwealth exercised its challenges on the basis of race." *Id.*

Following this decision from the Kentucky Supreme Court, Harris filed a motion in Jefferson Circuit Court to vacate his sentence. The trial court denied this motion, and the Court of Appeals of Kentucky affirmed. When Harris subsequently filed a motion for discretionary review in the Supreme Court of Kentucky, the court denied it.

Harris thus initiated the instant federal habeas corpus petition under 28 U.S.C. § 2254 in the United States District Court for the Western District of Kentucky at Louisville on November 25, 2003. The district court denied Harris's petition. *Harris v. Haeberlin*, No. 3:03CV-P754-H (W.D. Ky. March 16, 2005). With respect to Harris's *Batson* claim, the district court detected "no error in the [Kentucky] circuit court's application of the applicable three-step [*Batson*] process." *Id.* at *10. Additionally, the district court found that Harris had failed to proffer "clear and convincing evidence" to rebut the presumption of correctness underlying factual findings by state courts in habeas proceedings. *Id.* The district court further took notice of the fact that, at Harris's trial, the jury itself contained some black members, thereby refuting any "pattern of purposeful racial discrimination in its selection." *Id.*

After denying Harris's habeas petition, the district court did find that Harris was entitled to a certificate of appealability on the *Batson* issue alone. While the district court concluded that no *Batson* violation had transpired during Harris's trial, the court noted that "no less than three justices of the Kentucky Supreme Court would have remanded [Harris's] case for an evidentiary hearing on [the *Batson*] issue." *Id.* at *30. The number of dissenters in the Kentucky Supreme Court convinced the district court that "jurists of reason could find [the Kentucky Supreme Court's] conclusion regarding [Harris's] *Batson* claim to be debatable or wrong." *Id.* Harris timely appealed to this Court.

## II. STANDARD OF REVIEW

We employ a de novo standard to review the district court's legal conclusions in habeas proceedings. *Miskel v. Karnes*, 397 F.3d 446, 451 (6th Cir. 2005); *Dennis v. Mitchell*, 354 F.3d 511, 516-17 (6th Cir. 2003). We generally review the district court's factual findings under a clear-error standard. *Dennis*, 354 F.3d at 517.

Because Harris filed his habeas petition on November 25, 2003, after AEDPA became effective on April 24, 1996, AEDPA governs our review of the decisions of the Kentucky trial and

appellate courts. *See Lindh v. Murphy*, 521 U.S. 320, 323 (1997) (holding AEDPA applicable to petition filed after AEDPA's effective date); *Carter v. Mitchell*, 443 F.3d 517, 524 (6th Cir. 2006).

In AEDPA, Congress provided that:

an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (d)(1)-(2).

In construing the "contrary to" and "unreasonable application" clauses of § 2254 (d)(1), the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362, 413 (2000), provides us with guidance. Under the "contrary to" clause, a federal habeas court may grant a petitioner's writ "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413.

Under the "unreasonable application" clause, habeas relief is available if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Dennis*, 354 F.3d at 517 (citing *Williams*, 529 U.S. at 413). This clause is also triggered when a "state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006).

Under both clauses, the Supreme Court has interpreted "clearly established Federal law" to encompass only its "holdings, as opposed to the dicta" in its opinions. *Keith*, 455 F.3d at 669 (quoting *Williams*, 529 U.S. at 412). And in both situations, the central inquiry is "whether the state court decision was objectively unreasonable and not simply erroneous or incorrect." *Id*. That is, in applying the "unreasonable application" clause, a reviewing court must be careful not to substitute its own judgment for that of the state court by equating the more stringent standard of "objectively unreasonable" with the more lax standard of "clear error." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

In addition to his § 2254 (d)(1) claims, Harris also invokes § 2254 (d)(2) to challenge the Kentucky Supreme Court's finding of facts as unreasonable in light of the after-acquired videotape evidence. In assessing Harris's factual claim, we accord a presumption of correctness to the Kentucky court's factual findings. 28 U.S.C. § 2254 (e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Thus, we must accept the state court's fact-finding, unless Harris submits evidence clearly and convincingly to the contrary. 28 U.S.C. § 2254 (e)(1).

Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254 (d)(2) is "demanding but not insatiable." *Dretke*, 545 U.S. at 240 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ( internal quotations omitted)). Accordingly,

"[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Cockrell*, 537 U.S. at 324.

## III. DISCUSSION

On appeal, Harris tenders two grounds for reversing the district court's denial of his petition for habeas corpus. First, pursuant to § 2254 (d)(1) of AEDPA, he argues that he is entitled to habeas relief on his *Batson* claim because "the Kentucky Supreme Court unreasonably applied clearly established federal law when it independently analyzed significant factual evidence [from the videotape] that was not available to the trial court at the time it ruled on . . . Harris's *Batson* challenge." (Appellant's Br. at 36.) Second, pursuant to § 2254 (d)(2) of AEDPA, he claims that the district court engaged in an unreasonable determination of the facts when it affirmed the Supreme Court of Kentucky's denial of his *Batson* claim. Harris's first argument, which is more narrow and procedural in scope, convinces us of the need for a remand to the district court to conduct a renewed *Batson* hearing in light of the videotaped evidence. Accordingly, we do not reach the merits of Harris's second argument.

In advancing his first argument, Harris surveys *Batson* and its progeny to find "wide recognition" for the proposition that appellate courts are ill-suited "on the basis of a cold record . . . to assess subtle factual and atmospheric issues of credibility and motivation." (*Id.*) For example, Harris cites to *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (opinion of KENNEDY, J.), to buttress his claim that, in the *Batson* context, "the evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." Likewise, Harris points to *Johnson v. California*, 545 U.S. 162, 173 (2005),[2] in which the Supreme Court explained that trial judges should resolve *Batson* claims to avoid appellate guesswork: "[t]he disagreement among the state-court [appellate] judges who reviewed the record in this case illustrate the imprecision of relying on judicial speculation to resolve plausible claims of discrimination." Harris thus marshals the foregoing cases to extract two principles governing *Batson* claims: (1) a trial court is best positioned to review evidence on the issue of discriminatory intent; and (2) the trial court must have access to the full evidentiary record before it can properly rule on a *Batson* challenge.

The state responds by invoking the Supreme Court's unanimous decision in *Rice v. Collins*, 546 U.S. 333 (2006). In that case, when the defendant opposed the prosecution's exercise of a peremptory challenge against juror 16, the prosecution explained that it disqualified her because she had rolled her eyes in response to a question from the court, was young and possibly too tolerant of drug crimes, and lacked sufficient connections to the community. *Rice*, 546 U.S. at 336. The trial court subsequently affirmed the prosecution's race-neutral reasons. *Id*. at 337.

During the defendant's habeas appeal before the Ninth Circuit, however, that court disagreed with the trial court's credibility determination and found it factually unreasonable to accept the prosecution's justifications based on juror 16's demeanor and youth. *Id*. at 339; *Collins v. Rice*, 365 F.3d 667, 679-685 (9th Cir. 2004) (Hall, J., dissenting). Conducting its own review of the underlying facts, the Ninth Circuit found the prosecutor lacking in credibility because she had previously referred to another juror as "young" despite that juror's status as a grandmother, had attempted impermissibly to employ gender as a race-neutral basis for striking juror 16, and had claimed juror 16 would be too lenient toward a drug crime even though juror 16 expressed an affirmative belief that the crime at issue should be illegal. *Id*. at 340-41. After assessing the Ninth Circuit's reasons for doubting the prosecutor's credibility, the Supreme Court disagreed that the trial court's factual findings were unreasonable. At most, the Supreme Court explained, "the trial court

---

[2]The dissent characterizes our opinion as "rel[ying] on" *Johnson* in support of our ultimate conclusion. The first sentence of this paragraph makes clear, however, that we cite to *Johnson* not as part of our own analysis, but instead to develop the arguments Harris set forth on appeal.

had reason to question the prosecutor's credibility regarding [j]uror 16's alleged improper demeanor," but this does not translate into the "conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications." *Id*. at 341. Overall, the Supreme Court reversed the Ninth Circuit's decision because the court "attempt[ed] to use a set of debatable inferences to set aside the conclusion reached by the state court [in violation of] AEDPA's requirements for granting a writ of habeas corpus." *Id*. at 342.

In citing *Rice*, the State attempts to analogize the after-acquired videotape evidence, which the trial court in the instant case was unable to consider because it had not yet surfaced, to the eye-rolling, which the trial court in *Rice* missed. The State's argument would have it that, just as it was reasonable for the trial court to credit the prosecutor's race-neutral reasons without directly observing the alleged eye-rolling, it is reasonable for the Kentucky trial court to have credited the prosecutor's race-neutral reasons without examining the videotaped evidence.

We are unpersuaded, however, by the State's invocation of *Rice*. First, *Rice* can be distinguished on the nature of its factual record. In that case, the factual record facing the state appellate court was identical to the factual record facing the state trial court. *See* 546 U.S. at 339 (noting that the state appellate court had "before it only the trial court record."). In this case, however, the factual record facing the Kentucky Supreme Court differed considerably from the factual record facing the state trial court, due to the discovery of the videotaped evidence. *Rice*'s admonition to appellate courts to refrain from using "a set of debatable inferences" to displace the trial court's findings must thus be confined to the context in which the trial and appellate courts have before them identical records. *See id*. at 341-42.

In a case such as the one before us, however, where the appellate court has before it new evidence providing direct information about the prosecutor's state of mind, clearly established federal law regarding the trial court's superiority in making credibility determinations in a *Batson* hearing persuades us that a remand is appropriate. In *Hernandez*, for example, a plurality of the Supreme Court explained that an appellate court should grant "[d]eference to trial court findings on the issue of discriminatory intent" because "'the finding largely will turn on evaluation of credibility.'" 500 U.S. at 365 (quoting *Batson*, 476 U.S. at 98). The *Hernandez* Court further elaborated that the "evaluation of a prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Id*. (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)). Because the after-acquired videotape is an ideal piece of evidence with which to assess prosecutorial credibility, the Kentucky Supreme Court unreasonably applied clearly established federal law, as enshrined in *Hernandez*, when it upheld the trial court's *Batson* finding without allowing it to consider this new evidence.[3]

The dissent attacks our reliance on *Hernandez* as a basis of clearly established federal law by characterizing its contents as mere dicta. While the dissent is correct in pointing out that *Hernandez* is a plurality opinion, we cite to *Hernandez* for its explication of *Batson*'s holdings, which beyond doubt qualify as clearly established federal law.[4] Turning directly to *Batson*, several aspects of the opinion convince us that the case in fact holds that trial courts, not appellate courts, are to assume the responsibility of making factual determinations regarding a prima facie showing

---

[3] More recently, the Supreme Court stated that "in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, *all of the circumstances that bear upon the issue of racial animosity must be consulted.*" *Snyder v. Louisiana*, — S.Ct. —, 2008 WL 723750, at *4 (Mar. 19, 2008) (emphasis added).

[4] That *Hernandez*'s explication of *Batson* amounts to clearly established federal law, we believe, is further reflected by the Court's citation to *Hernandez* for, among other issues, the proposition that "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. See *Hernandez v. New York*, 500 U.S. 352, 269, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). *Snyder*, 2008 WL 723750, at *4.

of discrimination, the prosecution's race-neutral explanation, and the ultimate existence of purposeful discrimination.

First, upon entertaining an appeal from the Kentucky Supreme Court, the *Batson* Court called for a remand directly to the Kentucky trial court, rather than the Kentucky Supreme Court. Specifically, the *Batson* Court held that

> [b]ecause the trial court flatly rejected the objection without requiring the prosecutor to give an explanation for his action, we remand this case for further proceedings. If the *trial court* decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed.

*Batson*, 47 U.S. at 100 (emphasis added).

It is the *Batson* Court's instruction to the trial court to engage in the relevant fact-finding regarding racial discrimination that persuades us that federal law clearly situates trial courts as the arbiters of *Batson* determinations.

Furthermore, the *Batson* opinion is replete with references to the trial court's central role in assessing the facts necessary to conduct the three-step inquiry into allegations of racially discriminatory peremptory challenges. For example, *Batson* maintains that "[i]n deciding whether the defendant has made the requisite showing, the *trial court* should consider all relevant circumstances." *Id*. at 96 (emphasis added). Likewise, the *Batson* Court vests its "confidence" in "*trial judges*, experienced in supervising voir dire, . . . to decide if the circumstances concerning the prosecutor's use of peremptory challenges create a prima facie case of discrimination." *Id*. at 97 (emphasis added). *Batson* further holds "the *trial court* will then have the duty to determine if the defendant has established purposeful discrimination." *Id*. at 98 (emphasis added). In explaining its assignment of the *Batson* inquiry to trial courts, the Court emphasizes that "findings in the context under consideration here will largely turn on evaluation of credibility." *Id*. at 98 n.21. Accordingly, the Court informs reviewing courts that they "ordinarily should give those findings great deference." *Id*.

In emphasizing the holdings of *Batson*, the *Hernandez* plurality explains

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

*Hernandez*, 500 U.S. at 365.

In the instant case, the after-acquired evidence contained in the videotape is undoubtedly an example of such "best evidence" because it captures the "demeanor of . . . attorney [Dolan] who exercise[d] the challenge[s]." *See id*. Thus, while the dissent is correct in stating that *Hernandez* never expressly precludes appellate courts from considering the effect of new evidence, given the rarity of such best evidence, we believe *Batson* requires that the trial court, not the appellate court, assess the prosecutor's demeanor as captured on the videotape.

The dissent rather boldly claims that our holding today eviscerates the well-established role of appellate courts in fact-finding. Our holding, however, neither accomplishes such a thing, nor even ventures to accomplish such a thing. Rather, we merely hold that when after-acquired "best

evidence" bearing on prosecutorial demeanor surfaces, it is the trial court, not the appellate court, that should consider the evidence as part of the *Batson* fact-finding process. Due to the narrowness of our holding, it would be unnecessary, and indeed premature, to delineate a more precise formula for permissible appellate court fact-finding.

Beyond clearly established federal law, the record does not reflect that Harris is at fault for the delayed discovery of the videotape evidence. If the tape were uncovered prior to the end of the trial in state court, there would undoubtedly have been a second *Batson* hearing to account for this new evidence. Because Harris acted with due diligence in reporting the discovery of the tape upon locating it after trial, we believe that procedural equity likewise requires a second *Batson* hearing. Accordingly, a remand is proper to reassess prosecutorial credibility in light of the videotaped evidence.

## IV. CONCLUSION

For the reasons articulated above, we **VACATE** the judgment of the district court and **REMAND** for proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

ALICE M. BATCHELDER, Circuit Judge, dissenting. The majority holds that the Kentucky Supreme Court unreasonably applied clearly established Supreme Court precedent, i.e., *Batson v. Kentucky*, 476 U.S. 79 (1986), when — at the petitioner-appellant's request on direct appeal — it made a factual determination on newly discovered *Batson* evidence, rather than remanding the case to the state trial court for a renewed *Batson* hearing on the new evidence. I must respectfully dissent.

**I.**

The Commonwealth of Kentucky charged Frederick Jesse Harris with several felonies, including kidnapping and robbery, and tried him to a jury in Jefferson County Circuit Court. During jury selection, Harris raised a *Batson* claim, alleging that the prosecution had unconstitutionally used peremptory challenges to strike certain venire members based on their race, i.e., African-American. The trial court applied *Batson*'s three-step analysis and determined that the prosecution's non-discriminatory reasons for excusing the jurors were legitimate and not pretextual. The trial proceeded and the jury — which included African-American jurors — convicted Harris as charged.

Harris appealed directly to the Kentucky Supreme Court and, among his numerous claims on appeal, reasserted the *Batson* claim on the theory that the trial court had erred by believing the prosecutor's proffered race-neutral explanations for the strikes. While preparing the appeal, Harris's counsel discovered that a portion of the prosecution team's conversation at counsel table regarding the peremptory strikes, which they had thought to be private, had actually been recorded on the trial videotape and correspondingly included in the record. In his appellate brief to the Kentucky Supreme Court, Harris began his *Batson* argument by stating: "The record on appeal in this case refutes much of what the prosecutor said about why he struck [three African-American venire members]." Apt.'s Br. to Ky. S. Ct., No. 98-SC-414-MR, *16 (Ky. Nov. 25, 1998). Harris then introduced the videotape, with its previously undisclosed (private) conversation (i.e., "the record in this case reveals that while the prosecutor, co-counsel and the lead detective in the case were discussing whom to strike or leave on the panel, the court's videotape system began recording," *id.*) to bolster his argument that "[t]he record certainly calls into question the credibility of the prosecutor." *Id.* at 17. It is noteworthy that Harris urged the Kentucky Supreme Court to consider the videotape evidence, deem the prosecutor not credible, and grant relief in the form of a new trial.[1] Harris never suggested that the Kentucky Supreme Court was forbidden — under *Batson* or any other principle or precedent — from reviewing the videotape for itself as a means of granting him relief. In fact, Harris relied on Kentucky law, pursuant to *Batson*'s deference to the states' discretion, to request a new trial, or alternatively, a renewed *Batson* hearing, explaining:

> In *Batson* [476 U.S. at 99 n.24], the United States Supreme Court left to the various lower court jurisdictions the mechanics of how trial courts should deal with jury selection discrimination claims. This [Kentucky Supreme] Court, in *Simmons v. Commonwealth*, 746 S.W.2d 393, 397-98 (Ky. 1988), made it clear that once a challenge is made to the exercise of peremptories, the trial court must then hold a

———————————

[1] There could be no more appropriate case than this for the invocation of the invited-error doctrine. Under the doctrine, "a party may not complain on appeal of errors that he himself invited or provoked the court to commit." *United States v. Wells*, 519 U.S. 482, 488 (1997) (editorial and quotation marks omitted) (citing *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993), and *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991)). But, as it turns out, the failure to apply the invited-error doctrine is among the least of the majority's mistakes in this case.

*hearing*. Obviously the hearing in this case did not include consideration of the most important facts in the record — the prosecutor's real reasons for his strikes.

> [Harris] was denied his right to a fair trial as guaranteed by the 6th and 14th Amendments to the United States Constitution and Sections 1, 2, 3, 7 and 11 of the Kentucky Constitution. He is entitled to a new trial. Alternatively, at the very least, [Harris] is entitled to a remand of his case to [the] circuit court for a hearing. *See Washington v. Goodman*, 830 S.W.2d 398, 402 (Ky. App. 1992).

Apt.'s Br. to Ky. S. Ct. at *19-20 (certain citation form altered).

The Kentucky Supreme Court considered the whole record, including the videotape, and concluded that "[t]he record supports the prosecutor's articulated reasons for striking [the] juror," and "the discovery that the prosecutor's peremptory strike conference had been partially videotaped warrants neither a reversal nor a remand for reconsideration." *Kentucky v. Harris*, No. 1998-SC-0414-MR, *9 (Ky. Mar. 16, 2000) (unpublished). The three dissenting justices argued for a remand to the trial court for a new *Batson* hearing on the basis of Kentucky precedent.

On federal habeas review, the district court established that the state trial court had properly applied *Batson*, noting that "[t]he record here shows no error in the [Jefferson County] circuit court's application of the applicable three-step process." *Harris v. Haeberlin*, No. 3:03-CV-00754, *10 (W.D. Ky. Mar. 16, 2005). The district court then addressed the videotape evidence[2] in a conclusory fashion, concluding that, "[w]hile the parties may disagree in their interpretation of the taped lawyer conversation, the decision of the Supreme Court of Kentucky was not an unreasonable application of *Batson* [and] no federal habeas relief is available on this ground." *Id*. at 10-11. But the court granted a Certificate of Appealability on this single issue, stating, without elaboration:

> No less than three justices of the Kentucky Supreme Court would have remanded [Harris's] case for an evidentiary hearing on this issue. While this Court concludes that no *Batson* violation occurred during jury selection at [Harris's] criminal trial, it nevertheless believes that [Harris] is entitled to further review of this claim only.

*Id*. at 30. Thus we were left to both define and resolve the issue in this appeal.

## II.

Let us be very clear about the purported error in this case. There is no longer any colorable claim that the Jefferson County Circuit Court erred in either its application or resolution of the *Batson* issue — that is, the state *trial court* decision was correct, based on the information before it at the time Harris raised the *Batson* challenge (during jury selection preceding his trial). Furthermore, there is no claim that the Kentucky Supreme Court — i.e, the state *appeals court* — erred in its application or resolution of the *Batson* three-step process, inasmuch as *Batson* itself expressly left it to the individual jurisdictions and lower courts to determine how to implement its holding. *See Batson*, 476 U.S. at 99 n.24 ("In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today."). The purported error, such as it is, stems from the Kentucky Supreme Court's — and correspondingly, the federal district court's — decision to consider for itself the newly discovered, after-acquired videotape evidence in the context of the *Batson* claim.

---

[2]The majority variously labels this evidence "newly acquired evidence," "after-acquired videotape evidence," or simply "new evidence." Regardless of the label, the point is the same: this is evidence that was introduced to the Kentucky Supreme Court on direct review (and the district court on habeas) that was not presented to the state trial court.

The majority grants habeas relief based on its conclusion that "the Kentucky Supreme Court unreasonably applied clearly established federal law, as enshrined in *Hernandez* [*v. New York*, 500 U.S. 352, 365 (1991)], when it upheld the trial court's *Batson* finding without allowing [the trial court] to consider this new evidence." The majority further specified: "*Batson* requires that the trial court, not the appellate court, assess the prosecutor's demeanor as captured on the videotape," and "we merely hold that when after-acquired 'best evidence' bearing on prosecutorial demeanor surfaces, it is the trial court, not the appellate court, that [must[3]] consider the evidence as part of the *Batson* fact-finding process." Both the conclusion and the holding are incorrect.

## A.

Under AEDPA, the phrase "unreasonable application of" Supreme Court precedent means that the state court "identifie[d] the correct governing legal principle from [Supreme Court] decisions but unreasonably applie[d] that principle to the facts" of the case. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). But, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (quoting *Williams*, 529 U.S. at 411). Even "a *firm conviction* that the state court was erroneous" is not enough. *Id*. at 75 (quotation marks omitted; emphasis added). Rather, "[t]he state court's application of clearly established law must be *objectively unreasonable*." *Id*. at 76 (emphasis added). And "clearly established law as determined by [the Supreme] Court refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quotation marks omitted); *see also Wright v. Van Patten*, 552 U.S. --, 128 S. Ct 743, 747 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner]'s favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (quotation marks and citations omitted)).

### 1.

*Hernandez v. New York*, 500 U.S. 352 (1991), is a plurality opinion, and thus, for all practical purposes, dicta. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (quotation marks and editorial marks omitted)). It is therefore questionable whether it would even qualify as "clearly established federal law."

More importantly, *Hernandez* actually holds that, on direct review, appellate courts are to review the trial court's *Batson* findings regarding discriminatory intent for clear error. *See Hernandez*, 500 U.S. at 372 (O'Connor, J., concurring). There is no suggestion that an appellate court cannot consider for itself the effect (or non-effect) of newly discovered evidence, nor is there any suggestion that either the Constitution or any other federal law requires a remand to the trial court for a renewed *Batson* hearing upon the mere discovery of new evidence. But that is just what the majority professes to have found "enshrined in *Hernandez*." Quite to the contrary, however, the *Hernandez* plurality explained that while deference to the trial court is preferred, "[t]he precise formula used for review of factfindings, of course, depends on the context," *id*. at 366, and the context before us here — the newly discovered or after-acquired evidence context — is distinctly different from the direct-review-of-the-trial-judge's-credibility-findings context in *Hernandez*. Thus, the fundamental premise set forth by the *Hernandez* plurality — that the trial judge is in the

---

[3]The majority actually used the word "should," for which I substituted "must" based on my assumption that "should" was merely a misstatement. If I am incorrect, and the majority actually intended to state the rule as a bland recommendation (i.e., should) rather than a requirement (i.e., must), then the majority's entire theory is untenable, inasmuch as no decision could ever be an objectively unreasonable application of such an equivocal suggestion.

best position to decide the credibility of the prosecutor at the time of the *Batson* proffer of non-discriminatory reasons — is wholly inapposite in the present context.

**2.**

Indeed, the Supreme Court has never retreated from its general premise that state appellate courts' factual findings are entitled the same deference on habeas review that we extend to state trial courts' factual findings. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981) (holding that § 2254 "makes no distinction between the factual determinations of a state trial court and those of a state appellate court"). In light of *this* clearly established Supreme Court precedent, the majority cannot justify its conclusion that the Kentucky Supreme Court was not merely incorrect but "objectively unreasonable," *see Lockyer*, 538 U.S. at 76, in making its own factual finding regarding this newly discovered evidence rather than *sua sponte* remanding the case to the trial court.

In fact, neither Harris nor the dissenting justices of the Kentucky Supreme Court argued or even suggested that *Hernandez* set out a constitutional prohibition that forbade the Kentucky Supreme Court from reviewing the newly discovered *Batson* evidence. The argument they raised was not based on any mandate from *Hernandez*, but rather, was that the Kentucky courts had expressed a preference for having the trial court decide *Batson* issues in the first instance. *See Washington v. Goodman*, 830 S.W.2d 398, 402 (Ky. App. 1992) (cited by the dissenting justices). The fact that remand would be prudent — and perhaps even dictated by state law on direct appeal — is irrelevant, inasmuch as "this case turns on the recognition that no clearly established law contrary to the state court's conclusion justifies collateral relief." *See Wright*, 128 S. Ct. at 747.

**3.**

*Johnson v. California*, 545 U.S. 162 (2005), offers no support for the proposition that the Kentucky Supreme Court's failure to (*sua sponte*) adopt a prohibition against appellate fact finding of newly discovered *Batson* evidence was an objectively unreasonable application of established precedent. In *Johnson*, the Court considered California's peculiar burden of proof on the prima facie showing, i.e., step one of *Batson*'s three-step approach. *See id*. at 168. In the present case, there is no contention that Harris failed to establish his prima facie case. Even before the revelation of the videotape evidence, the trial court had acknowledged the prima facie case and moved on to consideration of the prosecutor's proffered non-discriminatory reasons. The *Johnson* Court offers dicta to the effect that it had "assumed in *Batson* that the trial judge would have the benefit of all relevant [facts]," *id*. at 170, but there was no newly discovered evidence in *Johnson*, nor was there any speculation about how newly discovered evidence would be considered in a *Batson* review, other than the now-familiar concession "that States do have flexibility in formulating appropriate procedures to comply with *Batson*." *Id*. at 168. Indeed, Justice Thomas emphasized in dissent:

> Because *Batson*'s burden-shifting approach is a prophylactic framework that polices racially discriminatory jury selection rather than an independent constitutional command, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), States have wide discretion, subject to the minimum requirements of the Fourteenth Amendment, to experiment with solutions to difficult problems of policy, *Smith v. Robbins*, 528 U.S. 259, 273 (2000); *Dickerson v. United States*, 530 U.S. 428, 438-39 (2000).

*Id*. at 174 (Thomas, J., dissenting) (quotation marks omitted).

**B.**

We have previously explained that, in conducting our AEDPA review, we "may look to [] courts of appeals' decisions, not as binding precedent, but rather to inform the analysis of Supreme

Court holdings to determine whether a legal principle had been clearly established by the Supreme Court." *Foley v. Parker*, 488 F.3d 377, 382 (6th Cir. 2007). Certain cases are enlightening.

**1.**

In *Pemberthy v. Beyer*, 19 F.3d 857, 863 (3d Cir. 1994), the Third Circuit considered whether the district court had erred by conducting an evidentiary hearing on the petitioners' *Batson*-based habeas claim, rather than accepting the state appellate court's factual findings. Then-Judge/now-Justice Alito, writing for the panel, held, among other things, "that the district court erred in failing to accept the state *appellate court*'s factual determinations." *Id.* at 858 (emphasis added).

The Supreme Court had decided *Batson* while Pemberthy's direct appeal was pending. Thus, the trial court had not conducted a *Batson* hearing. When Pemberthy raised a *Batson* claim on direct appeal, the state appellate court did not remand the case to the trial court for a *Baston* hearing, but instead considered the evidence — thus, making factual determinations for itself in the first instance — and decided the claim. *See id.* at 862. The appellate court determined that the prosecutor had legitimate, non-discriminatory reasons for the strikes and denied the *Batson* claim. The state supreme court denied review and Pemberthy sought habeas relief. On habeas review, the district court concluded that the state appellate court had not made the pertinent factual findings and "thus decided that it should conduct a *Batson* hearing and proceeded to do so." *Id.* at 863. Ultimately, the district court "held that the state had failed to establish a legitimate justification for its peremptory challenges," and granted Pemberthy's petition. *Id.* The government appealed.

The Third Circuit began its analysis by citing *Hernandez*, 500 U.S. at 364, for the proposition that if the *Batson* claim was on "direct appeal from a federal criminal conviction, [a reviewing court] would give substantial deference to the findings of the district court judge who presided over the jury selection process." *Id.* at 864. But, the court continued, "[t]his appeal [] involves collateral attacks on state convictions, and thus both our court and the district court must defer to any factual determinations made by the state courts." *Id.* The court then applied *Sumner*, 449 U.S. at 546-47, to explain that — even in the context of a *Batson* claim — "[t]he Supreme Court has held [] that this [deference to state court fact-finding] applies, not only when a state trial court makes what are conventionally regarded as findings of fact, but *also when a state appellate court makes factual determinations* in a written opinion." *Id.* (emphasis added). The court then demonstrated that the state appellate court had made the pertinent factual findings and concluded:

> In sum, we hold that the Appellate Division made a factual determination that the prosecutor peremptorily challenged the prospective jurors in question because of their ability to speak Spanish, that this determination is fairly supported by the record, and that it was therefore binding on the district court.

*Id.* at 868. Since its issuance in 1994, *Pemberthy* has been cited 31 times and never challenged.

But, by the majority's reasoning here, *Pemberthy* is wrong, and worse, it is an objectively unreasonable application of *Batson* — a proposition with which I obviously disagree. But, even if the majority's position is correct and *Pemberthy* is wrong, the mere existence of the *Pemberthy* opinion (and the 31 cases citing it) serves notice that a subsequent, similar opinion is not objectively unreasonable. That is, this "mistake," such as it is, is proof positive that it was not "objectively unreasonable" for the Kentucky Supreme Court to make a similar mistake.

**2.**

Of course, the Third Circuit is not the only court to "misapply" *Batson* in a manner that the majority condemns. *See, e.g., Jones v. Jones*, 938 F.2d 838, 842-43 (8th Cir. 1991) ("Thus, *Sumner* requires us to also consider whether the Missouri Court of Appeals made any finding of fact

regarding the prosecutor's peremptory challenges."). If *Batson* actually mandates that only the trial court can decide the *Batson* issue in the first instance, then it is indeed odd that so many courts have considered *Batson* issues raised for the first time on appeal. *See*, *e.g.*, *Hidalgo v. Fagen, Inc.*, 206 F.3d 1013, 1019-20 (10th Cir. 2000) (reviewing a *Batson* claim raised for the first time on appeal for plain error); *United States v. Contreras-Contreras*, 83 F.3d 1103 (9th Cir. 1996) (same); *Esquivel v. McCotter*, 791 F.2d 350, 351 (5th Cir. 1986) (affirming state appellate court's factual decisions regarding a *Batson* claim raised for first time on appeal); *McGee v. Mississippi*, 953 So.2d 211, 214 (Miss. 2007) (considering a *Batson* challenge despite the fact that defendants raised it for the first time on appeal); *Pennsylvania v. Freeman*, 827 A.2d 385, 395-96 (Pa. 2003) ("Nevertheless, the relaxed waiver doctrine has obliged this Court to review a *Batson* claim raised for the first time on direct appeal."); *Brooks v. Alabama*, 695 So.2d 176, 180 (Ala. Cr. App. 1996) ("Because this issue is raised for the first time on appeal, it is reviewable only under the plain error rule."); *Hurts v. Woodis*, 676 So.2d 1166, 1172 (La. App. 1996) ("we note that this court has previously reviewed a *Batson* ruling even where, as here, the issue was raised for the first time on appeal"). In fact, despite a thorough search — as evidenced by the forgoing — I have been unable to locate any court in the country that has applied *Batson* in the manner the majority labels "clearly established."

## C.

Finally, consider *Miller-El v. Dretke*, 545 U.S. 231, 257 & n.15 (2005), in which the Supreme Court decided a *Batson* claim based on evidence that was never presented to the state trial court. Indeed, Justice Thomas wrote a 32-page dissent protesting this very fact, in which he stated:

> Not even the majority is willing to argue that the evidence before the state court shows that the State discriminated against black veniremen. Instead, [the majority] bases its decision [finding unconstitutional exclusion of black veniremen] on juror questionnaires and juror cards that Miller-El's new attorneys unearthed during his federal habeas proceedings and that he never presented to the state courts.

*Id*. at 279 (Thomas, J., dissenting) (citation and footnote omitted).

*Miller-El* is indeed a peculiar decision if the majority's rendition of "clearly established" Supreme Court precedent is correct and *Batson* mandates that only the state trial court may assess the evidence in the first instance, or, as the majority stated more specifically — "when after-acquired 'best evidence' bearing on prosecutorial demeanor surfaces, it is the trial court, not the appellate court, that [must] consider the evidence as part of the *Batson* fact-finding process."

## III.

I cannot agree that the Kentucky Supreme Court was obligated to (*sua sponte*) impose upon itself a prohibition against appellate fact finding on review of newly discovered *Batson* evidence. Moreover, I cannot agree that its failure to do so was an objectively unreasonable application of clearly established Supreme Court precedent. Therefore, I must respectfully dissent.